# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 8, 2002

## STATE OF TENNESSEE v. RANDY B. LONG

**Direct Appeal from the Circuit Court for Madison County**
**No. 00-515      Roger A. Page, Judge**

---

**No. W2001-01467-CCA-R3-CD - Filed July 12, 2002**

---

A Madison County deputy jailer saw a plastic bag of 2.5 grams of cocaine fall from the defendant's crotch area as he removed his clothing for a strip search after his arrest for possession of marijuana and drug paraphernalia. The defendant was subsequently convicted of possession of more than .5 grams of cocaine with the intent to sell or deliver, a Class B felony, and the introduction of contraband into a penal institution, a Class C felony. He argues on appeal that he cannot be convicted of introduction of contraband into a penal institution when his entrance into the jail was involuntary, and that the evidence was not sufficient to support his convictions. Based on our review of the record and of applicable law, we conclude that a voluntary entrance into a penal institution is not a requirement of the offense, and that the evidence was more than sufficient to support the defendant's convictions in this case. Accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

Clifford K. McGown, Jr., Waverly, Tennessee (on appeal); George Morton Googe, District Public Defender (of counsel on appeal); and J. Colin Morris, Jackson, Tennessee (at trial), for the appellant, Randy B. Long.

Paul G. Summers, Attorney General and Reporter; Thomas E. Williams, III, Assistant Attorney General; James G. Woodall, District Attorney General; and James W. Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## <u>FACTS</u>

At approximately 10:00 p.m. on November 3, 1999, the defendant, Randy B. Long, was a passenger in a small pickup truck that was stopped for the improper display of a license plate by

officers in the Metro Narcotics Unit of the Jackson Police Department. During the stop, the officers observed a partially smoked marijuana cigarette in open view on the floorboard of the passenger side of the vehicle's cab. After receiving the driver's consent to search the vehicle, they found a glass mirror with visible traces of white powder, a straw-like device, and a razor blade underneath the passenger seat. The defendant was arrested and taken to the county jail, where a plastic bag containing a white powder, which a forensic scientist later determined to be 2.5 grams of cocaine, dropped from his crotch area as he removed his pants for a strip search. He was subsequently indicted on one count of possession of more than .5 grams of cocaine with the intent to sell, one count of possession of more than .5 grams of cocaine with the intent to deliver, one count of possession of marijuana, one count of possession of drug paraphernalia, and one count of introduction of cocaine into a penal institution.

The defendant's trial was held before a Madison County Circuit Court jury on January 24, 2001. Sergeant Matthew Hardaway testified that he and Investigator Jeff Shepard were in an unmarked unit on November 3, 1999, when they stopped the small pickup truck for the improper display of tags near the corner of Whitehall and Lane Avenue in Jackson. The vehicle contained three occupants: the driver, seventeen-year-old Michael Graham; fifteen-year-old Jessica Page, who was sitting in the middle; and the twenty-nine-year-old defendant, who was occupying the outside seat by the right passenger window. After observing the occupants "moving about inside the vehicle," Hardaway walked up to the passenger window, shined his flashlight inside, and saw what appeared to be a half-smoked marijuana cigarette lying on the passenger side floorboard. The occupants were asked to step out of the vehicle, and subjected to a pat-down for weapons. No weapons or contraband were discovered during this initial pat-down search.

Hardaway testified that the vehicle's occupants were subjected to a second, more thorough search after the discovery of the mirror, razor blade, and straw, which are items commonly used to cut up and snort cocaine. During the second search, he found a folded dollar bill inside the watch pocket of Graham's jeans, which was wrapped around a plastic baggie containing a white powder that appeared to be cocaine.[1] Although they conducted as thorough a search as they could on the scene, which involved "[a] pat-down of the outer clothing, pockets, shirt area, waistband, socks," and included "feel[ing] the crotch and buttocks," they found no drugs on the defendant's person. After the searches were completed, officers in a marked patrol car transported Graham and Page to juvenile detention and the defendant to the county jail.

Hardaway testified that he and Shepard were still waiting at the scene for a tow truck when they were notified that booking personnel at the jail had found a plastic bag of what appeared to be cocaine on the defendant. He and Shepard arrived at the jail approximately ten to fifteen minutes later, received the evidence from a deputy jailer, and took it to the narcotics office, where their field test confirmed that the substance was, in fact, cocaine. The evidence was then weighed, sealed in

---

[1] The plastic bag was subsequently found by a Tennessee Bureau of Investigation forensic scientist to contain .7 grams of cocaine.

an evidence bag, and placed in the locked evidence drop box for pickup the next morning by the evidence custodian who was responsible for placing it in the evidence vault. From there, it was transported to the Tennessee Bureau of Investigation ("TBI") laboratory for analysis. Hardaway testified that the plastic bag with the cocaine weighed "approximately four point three grams" on the scales he used at the narcotics office. On cross-examination, he testified that a 2.5 gram bag of cocaine (the amount the cocaine weighed upon subsequent testing at the TBI laboratory) would be a little smaller than a golf ball in size.

Michael Dale Graham testified that he was 18 years old, a recovering cocaine addict, and married to Jessica Graham, who formerly was Jessica Page. On November 3, 1999, he had paged the defendant, from whom he had bought cocaine in the past, and made an agreement to pick him up to buy more cocaine. According to their agreement, he was to give the defendant "[f]ifty dollars for some cocaine," and was to receive some extra cocaine as payment for giving the defendant "a ride around" in his truck. Graham acknowledged that there was a partially smoked marijuana cigarette on the passenger side floorboard when the police stopped his truck, and that he gave permission for the vehicle to be searched. He identified the glass mirror, razor blade, and "partially cut in half [ink] pen" that the police found underneath his wife's seat as his, and testified that the items had been used to snort cocaine. He said that he had put the cocaine he bought from the defendant into his pocket, and that he and the defendant had used the mirror, razor blade and cut pen to snort the cocaine that the defendant gave him in payment for the ride. Although he had handed the cosmetic mirror with the cocaine to his wife, who was 15 years old and his girlfriend at the time, he had been driving and did not know if she had used any.

Graham testified on cross-examination that he smoked a marijuana cigarette about "once or twice a week" and that he had smoked one the day before the defendant's trial. He had last used cocaine on New Year's Eve, approximately three weeks prior to the trial. He acknowledged that the charges against him had been reduced from a felony to a misdemeanor in exchange for his testimony in the defendant's case.

Sixteen-year-old Jessica Page Graham corroborated her husband's testimony that they had paid the defendant $50 for some cocaine, and received additional cocaine as payment for "carry[ing]" him to two houses to "[d]rop off what cocaine he had left." They were pulled over and arrested as they were taking the defendant back home. She and her husband subsequently pled guilty in juvenile court to possession of marijuana and paraphernalia. On cross-examination, she acknowledged that they received suspended sentences in exchange for their testimony at the defendant's trial. She additionally testified that their last use of cocaine occurred a year before the trial, and that her husband could not have used cocaine since that time without her knowledge.

Madison County Sheriff's Deputy Jailer Chris Gilley testified that he was assigned to the booking division of the jail on November 3, 1999, when Jackson police officers brought the defendant in to be booked for possession of marijuana. As part of the booking process, the defendant was taken to the "dress-out room" to be strip searched, showered, and dressed in inmate clothing. Gilley described what occurred during this process:

A    Okay.  [The defendant] removed his jeans, pants, whatever he was wearing, and what appeared to be a bag of cocaine fell from his crotch area onto the floor.

Q    Okay.  And what happened to this bag?

A    I picked it up and put it in the lockbox that we keep in booking there for evidence.

Q    Okay.  And did you actually observe this bag that you're talking about come or fall from his clothing –

A    Yes, sir.

Q    -- on the floor?  And what clothing was that that it fell from?

A    The -- I'm not sure if it was in his underwear or it was just pressed under the pants up against the underwear.  When he took his pants off, it fell from the crotch area.

Gilley was positive he saw the bag of white powder fall from the defendant's person, and that it could not have come from any other inmate.  He said that he notified the Jackson Police Department dispatch of his discovery of the evidence, which in turn notified the Narcotics Unit. Within an hour of his call, Investigator Shepard and Sergeant Hardaway arrived at the jail, and he took the evidence out of the lockbox and gave it to Investigator Shepard.

Investigator Shepard testified that in spite of not having found any drugs on the defendant during their searches at the scene, both he and Sergeant Hardaway "had the feeling that [he] had some more narcotics on his person."  He later explained that this feeling was based on their recognition, after the stop, of the defendant as the subject of a recent "CrimeStoppers" tip.  He said that he told the defendant twice at the scene that if he had drugs hidden on his person, the jailers would probably find it when he got to the jail, and that if he knowingly took drugs into the jail, he would be charged with the separate offense of introducing contraband into a correctional facility. He identified the chain of evidence form signed by Sergeant Hardaway, which, he said, indicated that the bag of white powder dropped by the defendant was signed into evidence at Metro Narcotics at 11:40 p.m. on November 3, 1999.  He testified that the substance field-tested positive for cocaine base, and that they had gotten "an approximate weight, including the plastic bag, of course, of four point three grams."

Brenda McNeil, an evidence technician at the Metro Narcotics Unit, identified the evidence form that the officers had filled out, which listed the evidence involved in the case.  She testified that she picked up the evidence from the sheriff's office drop box on November 4, 1999, at approximately 8:30 a.m., and placed it in the drug vault for storage, where it remained until she took

it to the TBI laboratory for testing on January 11, 2000. She retrieved the evidence from the TBI laboratory on May 24, 2000, and brought it back to the drug vault for storage. However, because the TBI technician who had conducted the analysis of the evidence was out on medical leave, she took the evidence back to the laboratory for retesting on January 14, 2001. She retrieved the evidence from the laboratory on January 19, 2001, and took it back to the drug vault, where it remained until the defendant's trial.

TBI forensic scientist Dana Clement identified the plastic bag of white powder at issue in this case, and testified that her records indicated that it was first brought into the TBI laboratory by McNeil on January 11, 2000. Her records further reflected that Lisa Mayes, another forensic scientist with the TBI, took it out of their evidence vault on January 13, 2000, to assign it a laboratory number and enter it into their computer. On May 15, 2000, Mayes took it out of the vault for analysis, and on May 24, 2000, it was returned to McNeil. Clement testified that McNeil resubmitted the evidence to their laboratory for reanalysis "on 1/4 of 2001." On that same day, the evidence was reassigned a new laboratory number and reentered into their computer. "[O]n 1/9/2001," it was removed from their vault and given to her for reanalysis.[2] Clement explained that she had been asked to conduct the second analysis of the drugs because Mayes was currently on medical leave and unavailable to testify at the defendant's trial.

During her analysis of the evidence, Clement first performed a "chemical color change test," which involved adding a chemical to a small portion of the sample that she had placed onto a "spot plate." Upon the addition of the chemical, the sample changed color, indicating that it was cocaine. Following the color change test, Clement performed an instrumental analysis of the substance by grinding up a small sample of the powder and placing it in an infrared spectrometer. Based on her analysis, Clement determined that the substance was cocaine, and that its weight, without packaging, was 2.5 grams.

Following Clement's direct testimony, defense counsel renewed an earlier objection to the introduction of the cocaine at trial, arguing that Clement's testimony that the evidence had previously been tested by Mayes, who was unavailable at trial, broke the chain of custody required for its introduction. The trial court overruled the objection, finding that the chain of custody had been satisfactorily met, and the trial continued with Clement's cross-examination testimony. On cross-examination, Clement acknowledged that there was a "substantial difference" between the 4.3 grams recorded by the officers who performed the field test and the 2.5 grams the substance weighed

---

[2] There is an apparent discrepancy between Clement's testimony that the evidence was resubmitted to the laboratory on January 4, and that she tested it on January 9, and McNeil's testimony that she resubmitted the evidence to the laboratory on January 14, and picked it back up after its reanalysis on January 19. However, at trial, neither witness was questioned about the differing dates, and neither brief discusses the apparent temporal impossibility. Thus, we presume that either McNeil misread the dates on the Jackson Police Department's evidence form as "1/14/01" and "1/19/01" when they were in fact intended to be "1/04/01" and "1/09/01," respectively, or that Clement made a similar type of mistake when she read her record of the evidence's resubmittal to the TBI laboratory and the date on which she performed her analysis.

when she conducted her analysis, but said that she assumed the field test had included the weight of the packaging, whereas the weight she had recorded did not. Although she admitted that she had never weighed the packaging, she testified on redirect that its weight was one possible explanation for the difference between the laboratory and field test weights.

The defendant elected not to testify, and no witnesses were presented on his behalf. Before the trial began, the prosecutor informed the trial court that the State would be unable to prove the charge of possession of marijuana, due to the fact that the drug had been consumed by Mayes's testing process. Consequently, that count of the indictment was dismissed, leaving the jury to deliberate on the four remaining counts of the indictment. After deliberating, the jury found the defendant guilty of the possession of more than .5 grams of cocaine with the intent to sell and deliver and the introduction of cocaine into a penal institution, and not guilty of the possession of drug paraphernalia. The trial court merged the two counts of possession of cocaine into a single conviction for the possession of more than .5 grams of cocaine with the intent to sell or deliver, a Class B felony, and sentenced the defendant as a Range I, standard offender to ten years in the Tennessee Department of Correction, to be served concurrently to his four-year, six-month sentence for his conviction for introducing contraband into a penal institution, a Class C felony.

Following the denial of his motion for a new trial, the defendant filed a timely appeal to this court, presenting the following issues for our review:

> I. Can the defendant be guilty of introducing contraband into a penal institution when he is brought to the penal institution under arrest?
>
> II. Is the evidence sufficient to support the finding of the defendant guilty?

## ANALYSIS

### I. Applicability of Tennessee Code Annotated section 39-16-201

As his first issue, the defendant contends that he "cannot be guilty of introducing contraband into a penal institution when he was brought to the institution under arrest." He argues that he cannot be convicted of this offense when his entrance into the jail was involuntary, and asserts that if his conviction is allowed to stand, the two officers responsible for bringing him and the cocaine into the jail against his will "are guilty of the same offense." We respectfully disagree.

The statute the defendant was charged with violating provides in pertinent part that:

> It is unlawful for any person to:

> (1) Knowingly and with unlawful intent take, send or otherwise cause to be taken into any penal institution where prisoners are quartered or under custodial supervision any weapons, ammunition, explosives, intoxicants, legend drugs, or any controlled substances found in chapter 17, part 4 of this title.

Tenn. Code Ann. § 39-16-201(a)(1) (1997). "Knowing" and "knowingly" are defined as follows:

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]

Tenn. Code Ann. § 39-11-106(a)(20) (1997).

When interpreting a statute, this court's role is to ascertain and give effect to legislative intent. Warren v. American Holding Co., 20 S.W.3d 621, 623 (Tenn. 1999). Whenever possible, legislative intent is to be ascertained from the natural and ordinary meaning of the language used. Schering-Plough Healthcare Prods., Inc. v. State Bd. of Equalization, 999 S.W.2d 773, 775 (Tenn. 1999). The plain language of Tennessee Code Annotated section 39-16-201(a)(1) requires proof only that the defendant knowingly and with unlawful intent took the cocaine into the jail. Nowhere in the statute is there a requirement that his entrance into the jail have been voluntary. Likewise, there is no basis in the statute for the defendant's assertion that the officers who caused him to be arrested and taken into the jail are guilty of introducing contraband into a penal institution. The officers acted neither knowingly nor with unlawful intent in causing the cocaine, which the defendant had concealed on his person, to be introduced into the jail. Although the officers may have suspected that the defendant had drugs concealed on his person, they had no knowledge that he did. The defendant told them that he did not have any drugs, and the officers were unable to find any when they searched him twice at the scene.

This issue is without merit.

## II. Sufficiency of the Evidence

As his second issue, the defendant challenges the sufficiency of the evidence in support of his convictions. He contends that the evidence was insufficient because "[i]t is possible that the cocaine was planted on him or there is some other innocent explanation." The State responds by arguing that the evidence was more than sufficient to support the convictions in this case. We agree with the State.

When the sufficiency of the convicting evidence is challenged on appeal, we must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). This court neither reweighs the evidence, see State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978), nor substitutes its inferences for those drawn by the trier of fact from circumstantial evidence. See Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Based on our review, we conclude that the evidence at trial, viewed in the light most favorable to the State, was more than sufficient to support the defendant's convictions. To prove the defendant guilty of these offenses, the State had to show that he knowingly possessed more than .5 grams of cocaine with the intent to sell or deliver, see Tenn. Code Ann. § 39-17-417(a)(4), (c)(1) (1997), and that he knowingly and with unlawful intent brought the cocaine into the jail. See id. § 39-16-201(a)(1) (1997). Michael and Jessica Graham both testified that the defendant sold Michael Graham cocaine, and that he gave them extra cocaine as payment for taking him to two houses to drop off additional cocaine that he carried with him. Sergeant Hardaway indicated in his testimony that he observed a suspicious amount of activity on the part of the occupants of the truck after the vehicle had been stopped, and before he and Investigator Shepard approached the passenger side window. Investigator Shepard testified that neither he nor Hardaway were able to discover any drugs on the defendant's person during the limited searches they were able to perform at the scene, but he warned the defendant that any drugs he might have hidden would probably be discovered upon his entry into the jail, which would result in his being charged with the introduction of contraband into a penal institution. Deputy Jailer Gilley testified that he witnessed the plastic bag containing the white powder fall from the defendant's person as he removed his clothing for a strip search. Finally, TBI Agent Clement identified the powder as 2.5 grams of cocaine. There was nothing in any witness's testimony to suggest that the cocaine had been planted on the defendant, as he hypothesizes might have occurred. The defense presented no proof.

Based on this evidence, the jury could reasonably conclude that the defendant knowingly possessed more than .5 grams of cocaine with the intention of selling or delivering it. The jury could further reasonably conclude that the defendant knowingly concealed the cocaine in his underwear or pants after the vehicle was stopped, lied to the officers about its presence, and failed to reveal its

existence to the sheriff's deputies when he was brought into the jail, in the hopes that it would remain undetected.

This issue is without merit.

## CONCLUSION

Based on our review of the record and applicable law, we conclude that the evidence was sufficient to support the defendant's convictions for introducing contraband into a penal institution and the possession of more than .5 grams of cocaine with the intent to sell or deliver. Accordingly, the judgment of the trial court is affirmed.

_____
ALAN E. GLENN, JUDGE